**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**FAYETTEVILLE SCHOOL DISTRICT** **PLAINTIFF**

**v.** **Case No. 5:26-cv-05228-DCF**

**J.A. and J.W., as Parents of**
**V.A., a Minor** **DEFENDANTS**

**COMPLAINT FOR JUDICIAL REVIEW UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT**

Plaintiff, Fayetteville School District ("District"), by its attorneys, Bequette, Billingsley & Kees, P.A., for its Complaint for Judicial Review Under the Individuals with Disabilities Education Act against Defendants, J.A. and J.W., as parents of V.A., a minor ("Parents"), seeking judicial review and reversal of the Final Decision and Order issued June 29, 2026, by an Arkansas Department of Education due process hearing officer in Case No. H-26-37, states:

**Parties**

1. The District is an Arkansas school district and a public corporation that may sue and be sued in its own name. *See* Ark. Code Ann. § 6-13-102(a).

2. Defendants J.A. and J.W. are the parents of V.A., a minor child with a disability as defined by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401(3)(A). V.A. is identified by her initials pursuant to Fed. R. Civ. P. 5.2(a)(3).

3. Parents reside in Washington County, Arkansas, and V.A. is enrolled in the Fayetteville School District.

4. Parents were the petitioners, and the District the respondent, in Arkansas Department of Education ("ADE") due process Case No. H-26-37, in which the hearing officer ("HO") issued the Final Decision and Order that is the subject of this appeal.

**Jurisdiction and Venue**

5. The District is a "party aggrieved by the findings and decision" of the HO in H-26-37 and brings this civil action pursuant to 20 U.S.C. § 1415(i)(2)(A). This Court has original jurisdiction over this action without regard to the amount in controversy. *See* 20 U.S.C. § 1415(i)(3)(A); 28 U.S.C. § 1331.

6. The HO's Final Decision and Order in H-26-37 was issued and filed with the ADE on June 29, 2026. This action is filed within ninety (90) days of that date and is therefore timely. *See* 20 U.S.C. § 1415(i)(2)(B).

7. This Court is the proper venue for this action. *See* 28 U.S.C. § 1391(b). The District is located in Washington County, Arkansas; Parents reside in Washington County; and the events giving rise to this Complaint occurred in Washington County. Washington County is within the Fayetteville Division of the Western District of Arkansas. *See* 28 U.S.C. § 83(b).

8. Pursuant to 20 U.S.C. § 1415(i)(2)(C), this Court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the Court determines is appropriate.

**The Administrative Proceedings**

9. This is the second due process proceeding between these parties. Parents filed their first due process complaint, ADE Case No. H-26-03, on August 18, 2025. That case was heard over ten days between November 2025 and January 2026, and the HO issued a Final Decision and Order in H-26-03 on February 18, 2026. In H-26-03, the HO found, among other things, that the District's initial removal of V.A. to an interim setting pending a manifestation determination review did not violate the IDEA's stay-put provision.

10. Parents filed their second due process complaint, ADE Case No. H-26-37, on February 27, 2026. The sole issue presented was whether the District denied V.A. a free appropriate public education ("FAPE") between August 19, 2025, and February 27, 2026, by allegedly violating the IDEA's stay-put provision and by allegedly failing to return V.A. to the placement from which she was removed after a manifestation determination review ("MDR") determined that her behavior on August 13, 2025, was a manifestation of her disability. The parties agreed to incorporate the entire record from H-26-03 into H-26-37.

11. The hearing in H-26-37 was conducted on April 15–16, 2026, in person, and on April 20, 2026, by Zoom. Both parties submitted comprehensive post-hearing briefs, and the HO issued her Final Decision and Order on June 29, 2026, finding in favor of Parents. The HO's Final Decision and Order (redacted) is attached hereto as Exhibit 1 and incorporated by reference pursuant to Fed. R. Civ. P. 10(c).[1]

**Statutory Framework: The IDEA and Arkansas Act 565**

12. Under the IDEA's disciplinary provisions, if the conduct for which a child with a disability was removed is determined to be a manifestation of the child's disability, the local educational agency "shall return the child to the placement from which the child was removed, unless the parent and the local educational agency agree to a change of placement as part of the modification of the behavioral intervention plan." 20 U.S.C. § 1415(k)(1)(F)(iii); 34 C.F.R. § 300.530(f)(2).

[1] Exhibits 2 through 7 contain personally identifiable information from V.A.'s education records protected by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and 34 C.F.R. Part 99. The District will file a motion for leave to file Exhibits 2 through 7 under seal. Exhibit 1, the Hearing Officer's Final Decision and Order, is not included in that motion and is filed on the public docket because it is provided in the redacted form in which it is a public record.

13. Under the IDEA's stay-put provision, during the pendency of due process proceedings, "the child shall remain in the then-current educational placement" unless the parties agree otherwise. 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a).

14. Under the IDEA and its implementing regulations, "placement" refers to the educational program and environment in which a child receives services along the continuum of alternative placements—not to a particular classroom, teacher, desk, lunch table, or arrival routine. *See* 34 C.F.R. §§ 300.114–300.116; *Concerned Parents & Citizens for the Continuing Educ. at Malcolm X (PS 79) v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 753–56 (2d Cir. 1980); *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003) ("placement" refers to the general educational environment, not the precise location); *A.W. ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 682 (4th Cir. 2004) ("the touchstone of the term 'educational placement' is not the location to which the student is assigned but rather the environment in which educational services are provided"). A change to a different classroom or teacher within the same school and program is not a change of educational placement.

15. During the 2025 regular session, the Arkansas General Assembly enacted Act 565 of 2025, the Teacher and Student Protection Act of 2025, which amended Ark. Code Ann. § 6-18-511 effective August 4, 2025. The General Assembly found that eighty percent of educators surveyed by an American Psychological Association task force reported being victims of threats or violence at school, and it declared its intent to provide a safe environment for teachers and students, to ensure that teachers and students do not suffer repeated violent or abusive behavior, and to ensure that proper measures are in place to prevent repeated acts of violence in schools. Act 565 of 2025, § 1.

16. Act 565 was drafted to operate in harmony with federal disability law, not in conflict with it. Section 6-18-511(a), as amended, begins: "Consistent with state and federal law, a teacher may remove a student from class . . . ." (emphasis added).

17. Act 565 expressly incorporates the IDEA's manifestation determination process. For a student identified under the IDEA or Section 504 who is removed from class, the statutorily required conference "shall serve as a manifestation determination review," Ark. Code Ann. § 6-18-511(d)(3), and where the behavior is determined to be a manifestation of the student's disability, the student may be "temporarily placed in an appropriate interim learning environment within the public school district for no more than ten (10) days" while the MDR team determines the appropriate course of action, *id*. § 6-18-511(f)(1)(A)—a period that mirrors the IDEA's own ten-school-day interim removal allowance. *See* 20 U.S.C. § 1415(k)(1)(B); 34 C.F.R. § 300.530(b)(1).

18. Critically, Act 565 itself distinguishes between a student's "placement" and a particular "class." The Act provides that a student removed for violent or abusive behavior shall:

> Not be placed in a class with the teacher or student against whom the violent or abusive behavior was directed if it is determined that the student may leave the appropriate interim learning environment and return to the placement from which he or she was removed.

Ark. Code Ann. § 6-18-511(e)(2) (emphasis added). The General Assembly thus expressly contemplated that the student *returns to the placement from which he or she was removed*—the very phrase used in 20 U.S.C. § 1415(k)(1)(F)(iii)—while being assigned to a different class than the teacher or students against whom the behavior was directed. Act 565 restricts classroom assignment; it does not restrict, and by its terms preserves, the student's placement.

19. Accordingly, a school district can fully comply with both the IDEA and Act 565 by returning a student with a disability to the school, grade, program, and continuum placement from

which she was removed—with her full Individualized Education Program ("IEP")—while assigning her to a different classroom section than the invoking teacher and affected students. That is precisely what the District offered here. It was reversable error for the HO to order otherwise.

**<u>Statement of Facts</u>**

**A. The August 13, 2025 Incident and Interim Removal.**

20. V.A. is an eight-year-old student who is eligible for special education and related services under the IDEA in the category of Autism. During the 2025–2026 school year she was enrolled in the second grade at Butterfield Trail Elementary School with an IEP and a behavior intervention plan ("BIP") developed at a facilitated IEP meeting on August 1, 2025, in which Parents participated.

21. On August 13, 2025—the second day of the school year—V.A. became severely dysregulated following a perceived loss of her noise-cancelling headphones. She became physically aggressive toward multiple staff members and peers, injured multiple staff members, climbed onto another student's back and grabbed her by the shoulders, and caused property damage while the remainder of the class was evacuated from the room.

22. Two Butterfield teachers involved in the incident, including V.A.'s general education teacher and her special education teacher, invoked the protections of Act 565. Consistent with Ark. Code Ann. § 6-18-511(e)(1) and (f)(1)(A), and consistent with the IDEA's ten-school-day interim removal allowance, 34 C.F.R. § 300.530(b)(1), Parents were notified that V.A. would be provided interim services at the District's alternative learning environment, not to exceed ten days, pending an MDR conference to determine if V.A.'s conduct was a manifestation of her disability. V.A. was not suspended for the August 13, 2025 incident.

23. In H-26-03, the HO found that this initial interim removal pending the MDR did not violate the IDEA. That ruling is not at issue here.

**B. The MDR and the District's Offer to Return V.A. to Butterfield.**

24. The District convened the MDR on August 22, 2025—within the ten-day window. The MDR team, which included the teachers who had invoked Act 565, determined that V.A.'s conduct on August 13, 2025, had a direct and substantial relationship to her disability and was therefore a manifestation of her disability.

25. At the MDR, the District presented three placement options, each with V.A.'s full IEP services: (1) return to Butterfield Trail Elementary, in a second-grade general education classroom, with the adjustments necessary to keep V.A. separated from the specific teacher and the three or four students who had invoked or were covered by Act 565 protections; (2) placement at another District elementary school with no limitations on access to any students (Asbell, Leverett, or Washington Elementary); or (3) placement at SOAR Academy, the District's alternative setting.

26. Before the MDR, the Butterfield principal, Jennifer Fairchild, had prepared a reentry plan describing how V.A. would return to Butterfield consistent with both her IEP and Act 565. Under that plan, V.A. would return to Butterfield, be assigned to a second-grade general education classroom with nondisabled peers, receive all services specified in her IEP and BIP, and continue her existing speech therapy, occupational therapy, and adaptive behavior services, with the same special education designee. Ms. Fairchild stated at the MDR conference: "She will be a regular second grade student and her placement won't change."

27. Butterfield had five second-grade classrooms. Ms. Fairchild testified at the due process hearing that a second-grade classroom with a different "Encore" (specials) schedule could be identified so that V.A. would not intermingle with the affected teacher and students even during PE, music, or art. The only students from whom V.A. needed to be separated were the handful of children in the one affected classroom. Draft logistical notations in the reentry plan concerning arrival, dismissal, and lunch were working drafts that had not been "completely vetted out" and

were details the District stood ready to work through collaboratively with Parents; as the District's Director of Special Services testified, they "would have easily been worked out" had V.A. returned.

28. At the MDR, the District also agreed to Parents' request for a registered behavior technician ("RBT") to support V.A., a commitment the Superintendent personally approved. The District thereafter promptly hired an RBT.

**C. The District's Written Offers and Parents' Rejection.**

29. The District memorialized the MDR outcome and the three offered placements in a Notice of Action dated August 22, 2025, provided to Parents and their counsel. The August 22, 2025 Notice of Action is attached hereto as Exhibit 2 and incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

30. On August 27, 2025, the District's Director of Special Services emailed Parents and counsel confirming that an RBT had been hired and assigned; that a permanent RBT hire was in process; that a homebound teacher had been assigned to bridge the transition; that the receiving principal had been contacted; and that a proposed start date of September 3, 2025, had been identified.

31. On August 28, 2025, Parents, through counsel, rejected all offered options and instructed the District to stand down. Counsel's email advised the District that there was "no benefit in your rush to have [V.A.] return to school, push a teacher into their home, or have her complete work until evaluations are completed and treatment plan can be developed," and stated that "the family intends to follow the recommendations of the doctors and will provide that to you for the IEP Team's consideration once that information becomes available." Counsel's August 28, 2025 email is attached hereto as Exhibit 3 and incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

32. On August 29, 2025, the District issued a second Notice of Action acknowledging Parents' decision not to return V.A. to school, confirming that the District had not denied any services, confirming that the District stood ready to implement the proposed plan immediately, and offering to reconvene the IEP team upon receipt of the updated information Parents had promised. The August 29, 2025 Notice of Action is attached hereto as Exhibit 4 and incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

33. Between August 29, 2025, and the filing of the H-26-37 complaint on February 27, 2026, Parents never requested an IEP meeting, never accepted any offered placement, never provided the promised medical information, and did not return V.A. to any District school. Throughout that period, the District in good faith provided weekly packets of grade-level coursework and District Chromebook access with online learning programs, which the family used at home.

**The Hearing Officer's Decision and Order**

34. In her June 29, 2026 Final Decision and Order, the HO found that the District procedurally violated the IDEA by (1) violating the stay-put provision, 20 U.S.C. § 1415(j), and (2) failing to return V.A. to the placement from which she was removed after the MDR, 20 U.S.C. § 1415(k)(1)(F)(iii), and that these violations substantively denied V.A. a FAPE between August 19, 2025, and February 27, 2026.

35. The linchpin of the HO's decision was her conclusion that the District's offered return to Butterfield was "not a true return to the status quo" because—in order to comply with Act 565—V.A. would have been assigned to a different second-grade classroom, with associated adjustments to non-instructional logistics such as arrival, lunch, and recess. The HO treated the classroom reassignment and draft logistical adjustments as a unilateral "change of placement."

36. The HO expressly refused to give any effect to Act 565, ruling that "[t]o the extent the District relied on Arkansas Act 565, state law cannot override the IDEA's federal stay-put mandate," that "[f]ederal law controls where the two conflict," and that "[s]tate-law restrictions cannot excuse noncompliance with a federal stay-put or manifestation-remedy requirement." The HO never analyzed the text of Act 565, never addressed its express incorporation of the IDEA's MDR process, and never considered whether the two statutes could be—and were—harmonized by the District's offer.

37. The HO ordered the District to (1) "immediately return" V.A. to "the last agreed-upon placement in effect immediately before the August 13, 2025, removal," including attendance at Butterfield Trail Elementary in her "regular education classroom," "without the numerous restrictions previously suggested by the district, unless Parents and district agree otherwise in writing"; (2) provide compensatory Applied Behavior Analysis ("ABA") services of five hours per week from August 2026 through December 2026, at District expense, delivered by a qualified ABA provider, in addition to all IEP services; and (3) convene an IEP team meeting within ten school days of the Order.

38. By commanding the District to return V.A. to her prior classroom "without the numerous restrictions previously suggested by the district," the Order directs the District to disregard the classroom-separation mandate of Ark. Code Ann. § 6-18-511(e)(2) and effectively nullifies Act 565 as applied to any student whose violent or abusive behavior is determined to be a manifestation of a disability.

**<u>Post-Order Events; the Order's Obligations Remain Ongoing</u>**

39. Following the Final Decision and Order in H-26-03 and while H-26-37 was pending, the District funded and obtained the independent educational evaluations contemplated by the H-26-03 order (the order not under appeal), including a comprehensive psychological evaluation, a

functional behavioral assessment, an occupational therapy evaluation, a speech evaluation, a psychiatric assessment, and a physical therapy reassessment, and entered a memorandum of understanding with Pediatrics Plus under which V.A. received ABA services in May, June, and July 2026.

40. On July 15, 2026, the District convened an evaluation/programming conference attended by Parents, their counsel, their private providers, and District staff. The team reviewed the independent evaluations, determined V.A.'s continued eligibility under the category of Autism, and promoted V.A. to the third grade. A Notice of Action documenting the conference was provided to Parents on July 22, 2026, and is attached hereto as Exhibit 5 and incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

41. Notwithstanding the Order's directive that V.A. be "immediately" returned to her regular education classroom without restrictions, V.A. has not returned to Butterfield on a full-time basis. At the July 15, 2026 conference, Parents' own private board-certified behavior analyst recommended—and the team agreed—that V.A.'s return begin with one hour per day in the general education classroom at another District elementary school—Washington Elementary—supported by ABA services, with her day to be increased pursuant to progress criteria agreed upon by the District and the family. V.A.'s transition back to school under the Order is therefore ongoing and incomplete. The IEP team reconvened on July 28, 2026, and confirmed that V.A.'s phased return would proceed at Washington Elementary—Parents noting that Butterfield remains their preference and V.A.'s home-zone school—beginning with one hour of services per day, under a transition schedule that anticipates a return to a full instructional day no earlier than the week of November 2, 2026, and then only if defined progress criteria are met. The Notice of Action documenting the July 28, 2026 meeting was provided to Parents on July 29, 2026, and is attached hereto as Exhibit 6 and incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

42. Likewise, the Order's compensatory ABA directive is entirely prospective: it requires the District to fund five hours per week of ABA services from August 2026 through December 2026—an obligation that had not even commenced when this Complaint was filed and that will continue for months into the future.

43. The Order accordingly operates as continuing, prospective, injunction-like relief—not a set of discrete acts already completed. This appeal therefore presents a live case or controversy, and no question of mootness arises: this Court can grant effective relief by reversing the HO's decision and relieving the District of the Order's ongoing and future obligations. *Cf. Jefferson Cnty. Bd. of Educ. v. Bryan M.*, 706 F. App'x 510, 513 (8th Cir. 2017) (compliance moots an appeal only where the order "was not a continuing injunction and merely required [the appellant] to perform certain discrete acts"); *Mem. Op. & Order, Springdale Sch. Dist. v. E.C.*, No. 5:24-CV-05131 (W.D. Ark. Oct. 30, 2025), Doc. 37 (appeal moot where district had fully completed the discrete acts ordered and sought no stay or injunction pending review).

44. The District's implementation of the Order to date has been, and its continued implementation will be, under protest and with full reservation of its right to judicial review. The District expressly reserves all rights under 20 U.S.C. § 1415(i)(2), and nothing in its interim compliance shall be construed as acquiescence in the Order or as a waiver of any argument on review.

**<u>Standard of Review</u>**

45. Under 20 U.S.C. § 1415(i)(2)(C), this Court receives the administrative record, hears additional evidence at a party's request, and independently decides, by a preponderance of the evidence, whether the IDEA was violated, granting such relief as it determines appropriate. While a reviewing court gives "due weight" to the administrative fact-findings, *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982), questions of law—including the meaning of "placement" under the

IDEA, the construction of Ark. Code Ann. § 6-18-511, and the interplay between the two statutes—are reviewed de novo. The HO's decision rests on legal conclusions to which no deference is owed.

## Count I

**(Judicial Review and Reversal of the Final Decision and Order in H-26-37 Pursuant to 20 U.S.C. § 1415(i)(2))**

46. The District incorporates the foregoing paragraphs as if fully set forth herein.

47. The HO's Final Decision and Order is contrary to law, unsupported by a preponderance of the evidence, and should be reversed and vacated for at least the following reasons.

**A. The District complied with both the IDEA and Act 565; the HO's ruling erroneously manufactures a conflict between them and nullifies a valid state statute.**

48. The HO resolved this case on a false premise: that the District had to choose between the IDEA and Act 565. It did not. Act 565 restricts a returning student's classroom assignment—she may not be placed "in a class with" the teacher or students against whom her violent or abusive behavior was directed. Ark. Code Ann. § 6-18-511(e)(2). The IDEA's manifestation remedy requires the return of the child to her "placement." 20 U.S.C. § 1415(k)(1)(F)(iii). Because "placement" under the IDEA means the educational program and environment—not a particular classroom or teacher—a district complies with both statutes by returning the student to the same school, grade, program, services, and peers, in a different classroom section. Indeed, Act 565 itself presupposes exactly that result: its classroom restriction applies when "the student may leave the appropriate interim learning environment and return to the placement from which he or she was removed." Id. (emphasis added).

49. That is the offer the District made within nine days of the incident: return to Butterfield Trail Elementary, in a second-grade general education classroom, with her full IEP and BIP, the

same special education designee, the same related services, access to nondisabled peers at lunch and recess, and a newly hired RBT—differing from the pre-removal arrangement only in the classroom section, to honor Act 565. Under 34 C.F.R. §§ 300.114–.116 and the uniform weight of federal authority, a change in classroom or teacher within the same school and program is not a change of "placement." The District therefore satisfied 20 U.S.C. § 1415(k)(1)(F)(iii) as a matter of law.

50. The uniform weight of authority confirms that "educational placement" is a term of art referring to the child's educational program—not the "bricks and mortar" of a particular building, classroom, or seat. Courts define the term as something "between the physical school attended by a child and the abstract goals of a child's IEP." *Laster v. District of Columbia*, 394 F. Supp. 2d 60, 64–65 (D.D.C. 2005) (citing *Bd. of Educ. of Cmty. High Sch. Dist. No. 218 v. Ill. State Bd. of Educ.*, 103 F.3d 545, 548 (7th Cir. 1996)). Unless a parent can identify "a fundamental change in, or elimination of[,] a basic element of the education program," there has been no change in educational placement. *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C. Cir. 1984); *see also Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir. 1992) (same); *D.K. v. District of Columbia*, 983 F. Supp. 2d 138, 145–46 (D.D.C. 2013) (no change in educational placement where the new program is "substantially and materially the same" as the old); 71 Fed. Reg. 46,540, 46,588–89 (Aug. 14, 2006) ("[M]aintaining a child's placement in an educational program that is substantially and materially similar to the former placement is not a change in placement."). A change of location alone is likewise not a change of educational placement. *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) (educational placement means "the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school"); *Johnson v. District of Columbia*, 839 F. Supp. 2d 173, 178 (D.D.C. 2012) (physical placement and educational placement are not synonymous); *Spilsbury v. District of*

*Columbia*, 307 F. Supp. 2d 22, 26–27 (D.D.C. 2004) ("educational placement" encompasses the whole range of services a child needs and "cannot be read to only indicate which physical school building a child attends").

51. Measured against that settled standard, nothing the District proposed altered—much less fundamentally changed or eliminated—any basic element of V.A.'s educational program. The Act 565 separations at Butterfield touched only administrative, non-instructional components of the school day: which of five second-grade classroom sections V.A. would join, and working-draft logistics concerning arrival, dismissal, and lunch. Nothing in 34 C.F.R. § 300.320 (defining the individualized education program), § 300.39 (defining special education), or § 300.34 (defining related services) suggests that such administrative components of a school day constitute a child's educational programming unless the IEP contains specific goals, services, or accommodations addressed to those times—and V.A.'s IEP contained none. Every element of her program—her IEP and BIP, her speech, occupational therapy, and adaptive behavior services, her special education designee, her access to nondisabled peers, and the newly added RBT support—remained fully intact. Nor would any of the proposed separations, including the draft logistical details that had not been finalized, have impeded an "educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017).

52. Nor did the District unilaterally impose anything—it offered choices. Parents could return V.A. to her home school, Butterfield, with her complete educational program and a different classroom section; they could select any of three other elementary campuses—Asbell, Leverett, or Washington—with no restrictions whatsoever; or they could select SOAR Academy. An offer of multiple placement options, each carrying the student's full IEP, is the antithesis of a unilateral change of placement.

53. The HO's heavy reliance on *Hale ex rel. Hale v. Poplar Bluff R-I School District*, 280 F.3d 831 (8th Cir. 2002), is misplaced, and the HO ignored the dispositive differences between that case and this one. In *Hale*, the district unilaterally compelled a change in the student's physical placement—moving the student from the homebound setting in which he was then being served into a school building—leaving the family no option of remaining in the existing placement. And the authority on which *Hale* draws, *Board of Education of Community High School District No. 218 v. Illinois State Board of Education*, 103 F.3d 545, 548 (7th Cir. 1996), explains that courts construe "educational placement" narrowly by reference to the specific institution only in the expulsion context—where the child has been excluded from school altogether. *See Kaelin v. Grubbs*, 682 F.2d 595, 602 (6th Cir. 1982) (expulsion of a disabled child is a change in placement); *Sch. Bd. of Prince William Cnty. v. Malone*, 762 F.2d 1210 (4th Cir. 1985) (same). V.A. was neither expelled nor forced from her school. She was offered a return to Butterfield—her home-zone school—with every element of her educational program intact, and, in the alternative, three other campuses without restriction. The HO simply disregarded those differences.

54. The HO's contrary ruling—that "state law cannot override" the IDEA and that the District's reliance on Act 565 was legally irrelevant—rests on an implicit conflict-preemption holding that she never analyzed and that cannot be sustained. Preemption is disfavored, particularly in the field of education, "perhaps the most important function of state and local governments." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954); *see Milliken v. Bradley*, 418 U.S. 717, 741–42 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools"). The IDEA is Spending Clause legislation built on cooperative federalism; it sets a federal floor of procedural and substantive protections while leaving the states latitude in the administration of their schools. A state statute is displaced only where compliance with both statutes is impossible or where the state law stands as an obstacle to the accomplishment of

Congress's purposes. Neither is true here: the District's offer demonstrates that simultaneous compliance is not merely possible but straightforward, and Act 565—which expressly adopts the IDEA's MDR process and ten-day interim placement window, Ark. Code Ann. § 6-18-511(d)(3), (f)(1)(A)—furthers rather than obstructs the IDEA's objectives of safe, appropriate public education.

55. The HO's reading, by contrast, cannot be implemented without nullifying Act 565 as to every child with a disability whose violent behavior is found to be a manifestation of the disability—the precise category of cases the General Assembly legislated to address, and a category the General Assembly addressed expressly and with evident care in subsections (d)(3) and (f). The HO's Order goes further still: it affirmatively commands the District to return V.A. to her prior classroom "without the numerous restrictions previously suggested by the district," that is, to violate Ark. Code Ann. § 6-18-511(e)(2). An ADE hearing officer possesses no authority to invalidate an Arkansas statute, and settled principles of statutory construction require that federal and state law be read in harmony where, as here, a harmonious construction is available. This Court should reverse and hold that the District's offer complied with both the IDEA and Act 565.

**B. The District satisfied 20 U.S.C. § 1415(k)(1)(F)(iii) by offering return to the placement; a parent's refusal of the offer is not a district denial.**

56. The IDEA obligates a district to make FAPE available; it does not make a district the guarantor of attendance when parents refuse what is offered. Where a parent withholds consent to or prevents the child from receiving offered services, the district "shall not be considered to be in violation of the requirement to make available a free appropriate public education." 20 U.S.C. § 1414(a)(1)(D)(ii)(II)(aa); *Fitzgerald ex rel. S.F. v. Camdenton R-III Sch. Dist.*, 439 F.3d 773 (8th Cir. 2006); *Schoenfeld v. Parkway Sch. Dist.*, 138 F.3d 379 (8th Cir. 1998). The District offered return to Butterfield, offered three additional elementary campuses, hired an RBT, assigned

a homebound teacher, contacted the receiving principal, and identified a start date of September 3, 2025. Parents' counsel rejected everything and directed the District to stand down. V.A.'s absence from school from August 2025 through February 2026 was the product of that parental choice, not of any District act or omission.

57. Parents were entitled to meaningful participation; they were not entitled to dictate a particular classroom, teacher, provider, or methodology. *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 804–06 (8th Cir. 2011). The HO's conclusion that the District "failed to return" V.A. inverts the record: the District tendered the return; Parents declined it.

**C. The stay-put ruling is legally erroneous and cannot support a FAPE denial for the period at issue.**

58. The HO framed the exclusive issue as whether the District denied FAPE "between August 19, 2025, and February 27, 2026." Yet her stay-put holding was that the obligation attached "once Parents filed this due process hearing request"—that is, on February 27, 2026, the final day of the adjudicated period. A stay-put obligation that by the HO's own reasoning arose at the close of the relevant period cannot, as a matter of law or logic, support a finding that the District denied FAPE during that period.

59. As to the pendency of H-26-03, the HO found in H-26-03 itself—in a final, unappealed decision—that no stay-put violation occurred. The HO's re-adjudication of the same period in H-26-37 disregards that prior ruling. Moreover, throughout the pendency of both proceedings, the District repeatedly offered V.A. her educational program; it was Parents who declined to avail themselves of it. The stay-put provision preserves a child's program against unilateral district action; it is not violated by a district that stands ready to serve a child whose parents have elected to keep her at home.

**D. Any deprivation of educational benefit was caused by Parents, not the District.**

60. A procedural violation denies FAPE only where it compromises the child's right to an appropriate education, seriously hampers parental participation, or causes a deprivation of educational benefit. *K.E.*, 647 F.3d at 804–05. Causation is indispensable. Here, the record establishes that the sole cause of V.A.'s six-month absence was Parents' decision—announced through counsel on August 28, 2025—to keep her home pending private evaluations, followed by six months of silence. Parents fully participated in the MDR with counsel; the District issued two Notices of Action and a detailed follow-up email; and the District invited the IEP team to reconvene at any time. On these facts, no procedural violation, even if one existed, caused a deprivation of educational benefit attributable to the District.

**E. The compensatory ABA award is unwarranted and exceeds any proper remedy.**

61. Compensatory education is an equitable remedy for deprivations caused by a district's failure to provide FAPE. *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 (8th Cir. 2003). Because the District did not deny FAPE, no compensatory award may stand. Independently, the award is inequitable: it compensates for an absence Parents themselves caused; it prescribes a particular private methodology (ABA) that Parents demanded but that no district was obliged to adopt, *K.E.*, 647 F.3d at 806; and it creates the perverse incentive for parents to refuse offered placements, procure private services, and recover their cost from the public fisc. The award of five hours per week of ABA from August 2026 through December 2026 should be vacated.

**F. This appeal presents a live case or controversy and is not moot.**

62. A case becomes moot only when changed circumstances make it impossible for a court to grant any effectual relief to the prevailing party. *Ali v. Cangemi*, 419 F.3d 722, 723–24 (8th Cir. 2005) (en banc). In the IDEA context, a district's compliance with a hearing officer's order moots

an appeal of that order only where the order "was not a continuing injunction and merely required [the district] to perform certain discrete acts." *Jefferson Cnty. Bd. of Educ. v. Bryan M.*, 706 F. App'x 510, 513 (8th Cir. 2017).

63. The Order here is the antithesis of a completed set of discrete acts. Its return-to-placement directive remains executory: V.A. is attending school at Washington Elementary under a phased transition plan that does not anticipate a full instructional day before the week of November 2, 2026, and then only if defined progress criteria are met. *See* Exhibits 5 and 6. Its compensatory ABA directive is being performed now and continues through December 2026: as reflected in the District's August 17, 2026 Notice of Action, the District is arranging and funding thirty hours per week of RBT/ABA services—twenty-five transition hours plus the five compensatory hours ordered for August through December—delivered at Washington Elementary and the Pediatrics Plus clinic, with implementation details still under active discussion by the IEP team. The August 17, 2026 Notice of Action is attached hereto as Exhibit 7 and incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

64. Because the Order's central commands remain ongoing, this Court can grant effective relief at every stage of this action: it can reverse the decision, relieve the District of the Order's remaining and future obligations—including the compensatory ABA award running through December 2026 and the command that V.A. be returned "without the numerous restrictions previously suggested by the district"—and declare that the District's offer complied with both the IDEA and Act 565. That declaration independently sustains a live controversy, because the "without restrictions" mandate continues to govern the terms of V.A.'s ongoing reintegration and forbids the District from implementing Ark. Code Ann. § 6-18-511(e)(2) at any point in that process.

65. The Order also inflicts a continuing institutional injury on the District that independently sustains a live controversy. Under Ark. Code Ann. § 6-15-202, the District's superintendent must submit to the Division of Elementary and Secondary Education, by September 1 of each school year, a written Statement of Assurance certifying that, to the best of his knowledge, the District "is in compliance with all state laws and the Standards for Accreditation"—a certification subject to the enforcement provisions of Ark. Code Ann. §§ 6-15-202, 6-15-206(c)(1), and 6-15-207, with the District's accreditation status in question upon a failure to comply or to submit the assurance. So long as the Order commands the District to disregard the classroom-separation mandate of Ark. Code Ann. § 6-18-511(e)(2), the District cannot simultaneously comply with the Order and truthfully certify compliance with all state laws. The Order thus places the District's accreditation status in jeopardy each school year the "without restrictions" mandate remains operative—a concrete, recurring, and prospective injury that this Court can redress by vacating the Order.

66. This case is therefore unlike *Springdale School District v. E.C.*, No. 5:24-CV-05131 (W.D. Ark. Oct. 30, 2025), in which this Court dismissed a school district's IDEA appeal as moot. There, the hearing officer ordered only discrete acts—an evaluation, a functional behavioral analysis, an IEP meeting, and a new placement—each of which the district had fully completed before review, without seeking a stay or expedited relief, leaving nothing for the Court to undo. Here, by contrast, the obligations under review are continuing and prospective, the District's interim compliance is under protest and with express reservation of rights, and the relief the District seeks—release from the Order's ongoing and future commands—remains fully available.

**Prayer for Relief**

WHEREFORE, the District respectfully requests that this Court:

(a) receive the records of the administrative proceedings in H-26-37 (including the incorporated record of H-26-03) and hear such additional evidence as the parties may request, pursuant to 20 U.S.C. § 1415(i)(2)(C);

(b) reverse the HO's Final Decision and Order in H-26-37 and hold, based on the preponderance of the evidence, that the District did not deny V.A. a FAPE between August 19, 2025, and February 27, 2026;

(c) declare that the District's post-MDR offer to return V.A. to Butterfield Trail Elementary complied with both 20 U.S.C. § 1415(k)(1)(F)(iii) and Ark. Code Ann. § 6-18-511, and that the IDEA and Act 565 of 2025 may be, and here were, harmonized;

(d) vacate the Order in its entirety, including its remaining prospective obligations, and specifically the directive that V.A. be returned "without the numerous restrictions previously suggested by the district" and the award of compensatory ABA services from August 2026 through December 2026;

(e) declare that this appeal presents a live case or controversy and that the District's continued good-faith implementation of the Order under protest during the pendency of this action does not render the appeal moot;

(f) award the District its costs; and

(g) grant all other just and proper relief to which the District may be entitled.

Respectfully submitted,

BEQUETTE, BILLINGSLEY & KEES, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201-3469
Phone: (501) 374-1107
Fax: (501) 374-5092
Email: ckees@bbpalaw.com

By: **W. Cody Kees**
W. Cody Kees, Ark. Bar #2012118

*Attorneys for Fayetteville School District*

**EXHIBIT INDEX**

| Exhibit | Description | Date |
|---|---|---|
| 1 | Hearing Officer's Final Decision and Order, Arkansas Department of Education Case No. H-26-37 (redacted) | June 29, 2026 |
| 2 | Notice of Action following the Manifestation Determination Review (manifestation finding; three offered placements; RBT commitment) | Aug. 22, 2025 |
| 3 | Email from Parents' counsel to the District (rejecting all offered options and directing the District to stand down) | Aug. 28, 2025 |
| 4 | Second Notice of Action (District ready to implement immediately; offer to reconvene IEP team) | Aug. 29, 2025 |
| 5 | Notice of Action, Evaluation/Programming Conference (continued eligibility; promotion to third grade; phased return; provided to Parents July 22, 2026) | July 15, 2026 |
| 6 | Notice of Action, IEP Review/Revise Meeting (Washington Elementary agreed upon; transition schedule anticipating full instructional day the week of November 2, 2026; provided to Parents July 29, 2026) | July 28, 2026 |
| 7 | Notice of Action (acknowledging Aug. 10, 2026 parent email; thirty hours per week of RBT/ABA services, including the five compensatory hours ordered for August through December; Aug. 21, 2026 IEP meeting scheduled) | Aug. 17, 2026 |